## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| 103 INVESTORS I, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | |
| | ) | No. 01-2504-KHV |
| SQUARE D COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

103 Investors I, L.P. seeks to hold Square D Company liable for causing a building fire, under theories of negligence and strict liability.  This matter is before the Court on Defendant's Motion To Exclude The Testimony Of Plaintiff's Experts Carl Martin and Byron W. Sherman And Corresponding Motion For Summary Judgment (Doc. #85) filed January 28, 2005.  On March 30, 2005, the Court held a hearing under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), at which time the parties had an opportunity to question plaintiff's experts and present relevant evidence.

### Findings Of Fact

Defendant's Daubert motion and corresponding motion for summary judgment, and plaintiff's response thereto, follow the summary judgment format prescribed by D. Kan. Rule 56.1.  Based on that record, and the evidence presented at the Daubert hearing, the Court finds that the following facts are undisputed:[1]

_____

[1]        In the context of a Daubert hearing, the Court must make specific factual findings by a
(continued...)

Plaintiff alleges that in 1978, Square D designed and manufactured an electrical busway which caused a fire in plaintiff's building on March 1, 2001. A third party installed the busway in 1978, and the busway performed without incident for 23 years before the fire. Plaintiff proceeds on negligence and strict liability theories of manufacturing defect and failure to warn.

A bus duct consists of four parallel bus bars, i.e. metal bars which carry electricity throughout a building. During the manufacturing process, each bus bar is wrapped with two layers of mylar polyester insulation. The sides of the insulation overlap, but the overlap is not sealed. Within the bus duct, the four bars are placed side by side in a bus bar sandwich that is taped in the middle and at the ends. A fiberglass cloth is spiral wrapped around the entire sandwich, and a layer of liquid epoxy holds the fiberglass wrapping in place. At joints and spacers in the busway, the bars are not insulated. Consequently, at various locations, the surface of the bus bar is exposed.

The entire bus duct is contained within a metal housing. In this case, the bus duct ran through electrical rooms which were vertically stacked on each floor of plaintiff's building. On each floor, a janitorial closet with a slop sink was adjacent to the electrical room. Also on each floor, water stains ran to the busway from the slop sink in the janitorial closet.

The fire originated in the janitorial closet on the second floor of plaintiff's building. According to defendant's expert and in-house engineer, Ron Rush, the origin of the fire was most likely at the bus duct.

---

[1](...continued)
preponderance of the evidence. See, e.g., Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1119, 1123 (10th Cir. 2004); In re Aluminum Phosphide Antitrust Litig., 893 F. Supp. 1497, 1499 (D. Kan. 1995). To the extent any of the foregoing facts may be disputed, the Court finds that they have been established by a preponderance of the evidence.

Deposition of Ronnie E. Rush, Exhibit K to <u>Memorandum In Support Of Defendant's Motion</u> (Doc. #86) at 26.

### A.    Carl Martin

In July of 2001, plaintiff retained Carl Martin to investigate the cause and origin of the fire. Martin holds a bachelor of science degree in mechanical engineering from the University of Missouri at Rolla and a master of science degree in engineering management from the University of Kansas. He is a licensed engineer in Missouri, Kansas, Texas, Nebraska and Colorado, and is recognized by the National Association of Fire Investigators as a Certified Fire Investigator. Martin performs some 150 to 200 cause-and-origin analyses each year.

Before plaintiff retained Martin, the contents of the janitorial closet where the fire started had been destroyed, except for an eight-foot segment of busway. In forming his opinions about the cause and origin of the fire, Martin therefore relied on his examination of the busway and photographs taken by the fire chief.[2]

In November of 2001, Martin employed Dr. Byron Sherman to inspect the busway segment. Sherman holds a bachelor of science degree in electrical engineering, a master of science in electrical engineering and a Ph.D. in electrical engineering, all from the University of Missouri. He is a professor of electrical engineering at the University of Missouri, and has been an engineering professor for over 41 years.[3] Sherman did a non-destructive fluoroscopic examination of the busway segment to determine

---

[2]    The photographs did not depict all of the materials which burned in the fire, or combustible items which may have been in the room at the time of the fire.

[3]    His papers and lectures include Power Supply Transformer Current Requirements;
(continued...)

whether the bus bars had short-circuited.  Sherman's examination revealed numerous metallic particles on

the inner bus bars where shorting had occurred.  Based on visual inspection, Martin identified those

particles as "contamination" which consisted of "whitish fine particles" and "small melted balls of aluminum."

Deposition of Carl Martin, Exhibit A to Memorandum In Support Of Defendant's Motion (Doc. #86) at

51.  Defendant tested the "contaminants," however, and discovered that the aluminum balls were actually

tin (which is used in the manufacture of bus ducts) and that the whitish particles consisted of sodium,

chlorine, calcium, sulfur, silicon, phosphorus and zinc.

Martin prepared reports dated February 18, 2001, and March 25 and July 11, 2002.  The first

report was a joint report with Sherman.  Martin's first two reports stated that the contaminants caused

premature deterioration of the mylar insulation, which resulted in a short circuit between the bus bars, which

generated heat through the insulation, which caused the fire.[4]  Martin's third report took it as undisputed

---

[3](...continued)
Electrical Causes of Fires; Fundamentals of Investigation of Electrical Fires; Principles of Investigation of Fires Involving Electrical Appliances; Fundamentals and Advanced Techniques in the Investigation of Electrical Fires; Electrical Considerations for Fire Safety; Electrical Hazards to Property; Specific Causes of Recent Electrical Fires; Recent Developments in Electrical Fire Investigation; Recent Test Results in Suspected Electrical Fires; Electrical Features of Recent Fires; Electrical Hazards to Property; Enhancing the Relationship Between the Fire Investigator and the Electrical Engineer; Understanding Electrical Fires; and Electrical Principles in Fire Investigation.

[4]      Both reports stated that

examination showed that some metallic like material existed in the wrapping material predominately at the location where external heat and burn damage to the bus duct housing had occurred. . . . This condition is indicative of an internal defect in the insulation wrapping that resulted in premature deterioration and short circuiting of electrons through the bus bar insulation that generated heat.

Engineering Evaluation of Bus Duct Conditions, Exhibit C to Memorandum in Support of Defendant's
(continued...)

that (1) a short circuit occurred in the bus duct; and (2) the short circuit caused the fire.  Martin reiterated that the bus duct wrapping had various kinds of contamination, including a metallic tin material, and proceeded to address what Martin described as "[t]he primary dispute in this evaluation . . . the method of contaminant entry into the bus duct."  In the end, Martin concluded that the contaminants "could only have been placed within the insulation wraps during the manufacturing process."  Id. at S-2.  Martin concluded that the bus bar itself was not defective, but that the contamination, i.e. "the surface blemishes found on the bus bars," represented a defect.  Follow-Up Review of Bus Duct Conditions, Exhibit I to Memorandum in Support of Defendant's Motion (Doc. #86) at S-1.

To determine how the contamination got into the bus duct, Martin also did a physical test which led him to conclude that moisture, contaminants and metallic material could not penetrate the mylar insulation around the bus bars.  In this so-called "permeability test," Martin placed drops of water on a piece of mylar insulation which he placed over a beaker, to see whether water could soak through the insulation.  From this test, Martin concluded that the surface of mylar insulation is not water-permeable. Martin conducted no other tests or studies, and he never tested whether water and contaminants could penetrate the overlaps or seams in the mylar insulation.  Likewise, he never tested whether water and contaminants could contact the uninsulated areas of the bus bars and migrate down in between the bus bars and the mylar insulation.[5]

—————————————

[4](...continued)
Motion (Doc. #86) at S-3 to S-5.

[5]        The report described Martin's methodology in determining the cause and origin of the fire, as follows:

The methodology of data collection, analysis and evaluation in this case . . . involved the

(continued...)

Based on the permeability test, Martin concluded that the contamination did not result from water or other environmental sources, and that the contaminants "could only have been placed within the bus bar wraps during the manufacture of the busway section." Id. at S-2.  Martin does not know how busway is manufactured, however, and he is not familiar with the codes which govern the manufacturing process, what precautions are taken in the manufacturing process or whether Square D met the applicable standards. Before the busway left the factory, it was subjected to a "hi-pot" test which exceeds the required UL testing.  Deposition of Ronnie Edward Rush, Exhibit J to Memorandum in Support of Defendant's Motion (Doc. #86) at 52.  If the insulation had any breach or flaw caused by contaminants or otherwise, this test would have revealed them and the bus bar would have been discarded.

The original packaging material for the busway included warnings which stated "CAUTION" and "PROTECT   BUSWAY  CONTACT  SURFACES  FROM  CONTAMINANTS  SUCH  AS CONCRETE, WATER, CORROSIVE FUMES AND SALTS."  Id.  Rush testified that these warnings were in the installation instruction book and also affixed to the busway itself, at splice plates at every joint

---

[5](...continued)
identification of the conditions related to the fire, collection of applicable data, analysis of the data collected, development of reasonably possible hypothesis regarding the cause of the incident, testing of the hypothesis, selection of the most logical hypothesis through both inductive and deductive reasoning, leading to the conclusions developed.    This methodology described was established by the National Fire Protection Association (NFPA 921 Guide for Fire and Explosion Investigations) and prepared by the Technical Committee on Fire Investigations for the National Fire Protection Association (NFPA).

Id. at S-4.  In applying this methodology to determine the cause and origin of the fire, Martin reviewed photographic evidence of the fire scene, conditions, fire scene reports and "related examinations of physical evidence."   Other than this method, and the method of the permeability test, Martin's expert reports do not discuss his method.

between sections of the busway.  The maintenance supervisor for plaintiff's building, however, stated that he never saw any warning on any part of the busway.  See Exhibit I to Plaintiff's Memorandum in Opposition (Doc. # 88) filed February 17, 2005.  Martin's report of July 11, 2002 provided the following opinions on warnings:

> The review of the manufacturer's literature indicated that the bus duct should be kept from exposure to dirt, water, and dust.  Any bus duct in a commercial building will experience varying levels of exposure to dirt, dust, and water.  If this is a critical factor, some label warning on the bus duct should have been provided.  Exposure to dirt, dust, and moisture is a foreseeable consequence of a bus duct within its useable life.

Exhibit I to Memorandum in Support of Defendant's Motion (Doc. #86) at S-4.

### B.    Daubert Hearing Testimony

At the evidentiary hearing on March 30, 2005, Martin reiterated the opinions contained in his written reports.  He explained that he had examined the busway segment and reviewed photographs of the fire scene.  He testified that the fire originated in the bus duct near the floor on the second floor of plaintiff's building.  He opined that the mylar insulation around the inner bus bars contained contaminants which caused the mylar to deteriorate, which caused the bus bars to short circuit, which caused the fire.  Martin could not find another source of the contaminants, so he concluded that they had to originate in the manufacturing process.  Martin noted that the contaminants were in the insulation wrap in the middle of the busway segment, that tin is part of the manufacturing process, and that he found melted balls of tin in the insulation wrap.  In Martin's opinion, these melted balls of tin did not cause the fire; they were a result of the heat generated by the fire.  Based on his permeability test, Martin concluded that water could not permeate the surface of the mylar insulation, but he admitted that water could drain down inside the bus duct, contact the bus bars, and create a short-circuit which could ignite a fire.  He believed that this was

"a far stretch," due to the physical characteristics of the duct work.  Martin, however, did not explain what physical characteristic of the duct work would prevent water from draining into the duct.  He did not test whether water could drain into the duct work because he did not believe that moisture could reasonably enter the duct work in that manner.  Specifically, Martin testified that for chemical contaminants other than tin to cause the short circuit, they would have had to splash against the busway in significant concentration to penetrate the cover plate, avoid a train system (which he thought would have captured it), run through a connector and run through end wraps – all of which he thought was unlikely.  Martin acknowledged a remote possibility that moisture had entered the system in some way and caused the short circuit, but he re-stated his belief that the contaminants were introduced at the time of manufacture.

### Analysis

### I.      Defendant's Motion To Exclude Expert Witnesses

Defendant argues that the Court should exclude the testimony of plaintiff's experts because (1) their reports do not opine that defendant was negligent or that the busway was defective with regard to warnings or manufacture; (2) Martin is not qualified to opine about product defects or possible negligence; and (3) Martin's opinion is not scientifically reliable or relevant.[6]

#### A.      Legal Standard

The Court has broad discretion in deciding whether to admit expert testimony.  See Kieffer v. Weston Land, Inc., 90 F.3d 1496, 1499 (10th Cir. 1996).  Rule 702, Fed. R. Evid., provides that a

---

[6]      Defendant's motion to exclude testimony is facially directed to both Martin and Sherman, but it specifically discusses only the testimony of Martin.  At the hearing, defendant acknowledged that Sherman was not the object of the Daubert motion.  The Court therefore limits its analysis to Martin's testimony.

witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The touchstone of Rule 702 is helpfulness of the expert testimony, a condition that goes primarily to relevance. See BioCore, Inc. v. Khosrowshahi, 183 F.R.D. 695, 699 (D. Kan. 1998) (quoting Miller v. Heaven, 922 F. Supp. 495, 501 (D. Kan. 1996)). Thus, the Court must determine whether the proffered evidence would be helpful to the trier of fact. See BioCore, 183 F.R.D. at 699. In so doing, the Court examines specific subject areas of proposed expert testimony to ascertain whether each is sufficiently tied to the facts of the case so that it will be helpful to the fact finder. See id. Any doubts should be resolved in favor of admissibility. See id.

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." Mitchell v. Gencorp Inc., 165 F.3d 778, 780 (10th Cir. 1999). In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis. First, the Court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. See Fed. R. Evid. 702. Second, if the experts are so qualified, the Court must determine whether their opinions are "reliable" under the principles set forth under Daubert and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In determining whether a particular scientific theory is reliable, the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance

of a methodology in the relevant scientific community.  Daubert, 509 U.S. at 593-94.

## B.     Analysis

Defendant argues that various aspects of Martin's expert testimony should be excluded because he is not qualified to render some opinions, he did not offer some opinions in expert reports under Rule 26, and his testimony does not meet requirements for admissibility under Rule 702 and Daubert.[7]  The Court examines separately each aspect of the opinion to which defendant objects.

### 1.     Cause and Origin

Defendant argues that Martin should not be allowed to testify about the cause and origin of the fire because he did not perform tests or experiments to support his opinion.  Defendant specifically objects that Martin based his opinions on fire department photographs and inspection of busway segment, and did not test his theory on how or why the fire started.  Plaintiff argues that the origin of the fire is not in dispute and that Martin's credentials qualify him to render opinions on fire causation.

In Daubert, 509 U.S. 579 (1993), the Supreme Court "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in Kumho clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science."  Ad. Comm. Notes to Fed. R. Evid. 702; see also Kumho, 526 U.S. 137.  "Questions related to the bases and sources of an expert's opinion affect the weight to be assigned to that opinion rather than its admissibility.  The weight

_____

[7]       Plaintiff contends that the Tenth Circuit had the admissibility issue squarely before it in 103 Investors I, L.P. v. Square D Co., 372 F.3d 1213 (10th Cir. 2004), and implicitly held that its expert opinions could survive a Daubert challenge.  Plaintiff also argues that the Tenth Circuit opinion indicates that the issues should tried to a jury.  The Court draws no such inference, however, from the Tenth Circuit opinion.

and credibility of expert testimony are for the trier of fact to determine." Cohen v. Lockwood, No. 02-2246-JPO, 2004 WL 763961, at *2 (D. Kan. Apr. 8, 2004); see also Bitler, 391 F.3d at 1123 n.2 (shortcomings of testimony go to weight of evidence).

Martin testified that he investigated the fire in accordance with protocol set forth in the NFPA 921. NFPA 921 sets forth a six-step process in which a fire origin and cause investigator must (1) recognize the need to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data (inductive reasoning); (5) develop a hypothesis based on that data; and (6) test the hypothesis (deductive reasoning). See NFPA 921; Guide for Fire and Explosion Investigations (2001), Plaintiff's Exhibit 2. Here, Martin examined burn patterns in the building and examined the busway segment, finding conditions consistent with internal overheating. After reviewing fire scene photographs and the busway segment, Martin hypothesized that the fire started as a result of a short circuit. He and Sherman therefore conducted a destructive examination of the busway segment to test this hypothesis. Martin's investigation and methodology appear to be grounded in NFPA 921. Defendant argues that Martin's opinions should not be received because he (1) based his opinions on photographs and inspection of busway, and (2) did not inspect other equipment which was present in the room at the time of the fire. These factors go to the weight and credibility of his testimony, not its admissibility. Martin's testimony that the fire resulted from short circuiting in the bus duct is not inadmissable because he failed to follow established methods of inquiry in his field. Martin may testify that the short circuiting resulted from the presence of contaminants within the system. For reasons stated below, he may not characterize that contamination as the result of a manufacturing defect or opine that the contaminants must have been introduced during the manufacturing process.

### 2.    Design Defect

In his expert opinion of July 11, 2002, Martin expressly declined to discuss the design of the busway "because it is not likely that the design of the busway was a factor in the cause of the fire." Exhibit I to Memorandum in Support of Defendant's Motion (Doc. #86) at S-2. Defendant therefore seeks to exclude any opinion that it defectively designed the busway. Plaintiff has abandoned its defective design claim, so this issue is moot. See Pretrial Order (Doc. #52) at 4 n.1. Any testimony as to design defect is inadmissible.

### 3.    Manufacturing Defect

Defendant argues that Martin is not qualified to render an opinion that the busway had a manufacturing defect because he has never been involved in manufacturing busways, he does not know what steps are involved in manufacturing busways, he does not know what precautions were taken and he is not familiar with the applicable codes governing busway manufacture. See Exhibit A to Memorandum in Support of Defendant's Motion (Doc. #86) at 47-48. In the alternative, defendant argues that Martin's opinions do not meet Daubert tests for scientific reliability. Specifically, defendant argues that Martin's theories and methodologies (1) have not been tested; (2) have not been subjected to peer review; and (3) have no known potential rate of error; and (4) are not generally accepted by the scientific community. Plaintiff concedes that Martin's opinions have not been subjected to peer review and testing, but argues that Martin's scientific method has been used for decades and satisfies Daubert.

As noted above, Martin testified that the fire originated at the bus duct near the floor on the second floor of plaintiff's building. Martin opined that an internal defect in the insulation wrapping resulted in premature deterioration of the insulation and short circuiting of electrical current through the bus bar

insulation, generating heat, and ultimately fire.  Exhibit C to <u>Memorandum in Support of Defendant's Motion</u> (Doc. #86) at S-3 to S-5.  Martin further opined that the internal defect was contamination found on the inner bus bars and within the insulation wraps.  Martin concluded that the contaminants could only have been introduced into the busway during the manufacturing process.

In asking whether Martin is qualified to render an opinion whether the busway contained a manufacturing defect, <u>see</u> Fed. R. Evid. 702, the Court does not question Martin's general qualifications as a fire investigator.  His expertise on the busway manufacturing process, however, is less apparent. Martin testified that he has never designed a busway system or been involved in the manufacturing process, and that he is not familiar with the basic steps of the manufacturing processes specific to bus ways.  Martin stated that he is not familiar with what precautions are taken during the manufacturing process and that he has not talked with anyone to educate himself with respect to the manufacturing process.  Martin testified that he does not know what codes govern the manufacturing process, or whether defendant met those standards.  Martin acknowledged that he has not conducted any research into the manufacturing of bus ducts.  Plaintiff has not established that Martin has any expertise which is relevant to the question how contaminants got into this particular duct system.  Nor has plaintiff demonstrated any generally accepted scientific methodology for addressing this question, and plaintiff certainly has not shown that Martin followed such a method.

On this issue, Martin's methodology was to conduct one test – the so-called permeability test.  In this test, Martin poured water on top of mylar insulation to see whether it permeated the mylar.  From this test, Martin concluded that water cannot go through the surface of mylar.  But he conducted no test to see whether water and other contaminants could go around mylar, into the busway system.  In light of

undisputed evidence that not all portions of the bus bar system were insulated with mylar, and that the mylar insulation was not even sealed, this omission is glaring. The prospect that water and other contaminants entered the bus duct system by going around the mylar insulation is too obvious to summarily dismiss – especially in light of the fact that all of the janitorial closets which abutted the bus duct system revealed evidence of water stains running from the slop sinks to the busway.

If science offers a generally accepted methodology for determining whether the contamination resulted from the manufacturing process, or whether it resulted from janitorial practices, Martin has not explained what it is or how he applied it in this case. Martin's testing and hypothesis did not account for the admitted fact that water can enter a bus duct by going around the mylar insulation. This possibility cannot be summarily eliminated by Martin's unexplained opinion that this scenario would be a "far stretch." On this record, Martin's opinion that the contamination cannot be explained as anything but a manufacturing defect is not shown to be grounded in expertise or accepted methodology. Therefore it will not assist a jury.

Martin may testify that contaminants in the busway system caused the fire. He may not opine that these contaminants resulted from a manufacturing defect, however, because any such opinion is speculative. Therefore, Martin's opinion as to manufacturing defect is inadmissible.

### 4. Warning

Plaintiff claims that defendant failed to provide an adequate warning for the busway. In Martin's third report, he opined that "[a]ny bus duct in a commercial building will experience varying levels of exposure to dirt, dust, and water. If this is a critical factor, some label warning on the bus duct should have been provided." Exhibit I to Memorandum in Support of Defendant's Motion (Doc. #86) at S-4.

Defendant asserts that Martin's warning opinion should be excluded because it is not sufficient under Kansas law. Defendant specifically contends that Martin's opinion did not establish an alternative warning, or its feasibility, adequacy and effectiveness.

Plaintiff need not present an alternative warning, McHenry v. ICON Health & Fitness, Inc., No. CIV.A. 99-2351, 2001 WL 487949, at *8 (D. Kan. Apr. 4, 2001), and Martin's testimony is not inadmissible for failure to offer an alternative warning. His testimony is limited to that contained in his expert reports, however, and he did not offer an opinion on alternative warnings which would be feasible, adequate and effective. Therefore he may not advocate alternative warnings at trial.

Defendant argues that Martin's testimony should be excluded because he did not take into account the warnings which it provided on the busway and he offered no opinion as to the adequacy of those warnings. Plaintiff has presented evidence that the busway had no visible warning, however, so Martin's opinion should not be excluded on that ground.

### 5.     Negligence

Plaintiff claims that defendant breached its duty to use ordinary care in the manufacture of busway and to act as a reasonably careful manufacturer. Defendant argues that Martin is not qualified to render an opinion whether it acted negligently in manufacturing the busway. Plaintiff does not specifically respond to this argument. Martin admits that he is not familiar with what codes govern busway manufacture and that he cannot know whether defendant met these standards. Plaintiff has not demonstrated that Martin has the knowledge, skill, experience, training or education required under Fed. R. Evid. 702 to opine whether

defendant was negligent in the busway manufacturing process.[8]  The Court therefore cannot admit his

expert testimony as to any alleged negligence.

## II.     Summary Judgment

Plaintiff claims that defendant provided a busway which was defective and unreasonably dangerous

in its manufacture and in its warnings.  Additionally, plaintiff claims that defendant was negligent in its

manufacture of the busway.  Defendant argues that it is entitled to summary judgment on all claims because

plaintiff has no admissible expert testimony to support its claims of manufacturing and warning defects.

Defendant alternatively argues that even if Martin's expert testimony is admissible, plaintiff cannot prove

that the busway was defective when it left defendant's control and plaintiff therefore cannot establish strict

liability under Kansas law.  As to plaintiff's negligence claim, defendant argues that plaintiff cannot show

that (1) it breached the standard of care; or (2) its alleged negligence caused damage to plaintiff.  Plaintiff

essentially concedes these arguments but contends that even if the Court excludes Martin's expert

testimony, its failure to warn claim must survive because expert testimony is not necessary to prevail on

such claim.[9]

### A.     Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that

---

[8]        Defendant next argues that in Martin's depositions and reports, he did not offer opinions of negligence on the part of defendant in manufacturing.  Plaintiff contends that the law does not require an expert to explicitly and specifically opine that defendant was negligent; plaintiff further maintains that the expert may not tell the jury what result to reach.  Because Martin is not qualified to offer an opinion, the Court need not address this argument.

[9]        Plaintiff does respond to defendant's other arguments regarding summary judgment.

the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); accord Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th

Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing

law."  Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of

evidence.  Id. at 252.

    The moving party bears the initial burden of showing the absence of any genuine issue of material

fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City Of Watonga, Okla., 942

F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the

nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for

which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d

1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The

nonmoving party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d

at 1241.

    The Court must view the record in a light most favorable to the party opposing summary judgment.

See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary

judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly

probative.  See Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party

cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment

in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir.

1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require

submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

### B.    Analysis

#### 1.    Products Liability Claims

Plaintiff premises its claims on a theory of products liability. The Kansas Product Liability Act ("KPLA"), K.S.A. §§ 60-3301 to 60-3307, applies to all product liability claims regardless of the substantive theory of recovery. See Savina v. Sterling Drug, Inc., 247 Kan. 105, 126, 795 P.2d 915 (1990). Kansas law recognizes three ways in which a product may be defective: (1) a manufacturing defect, (2) a warning defect and (3) a design defect. See id. at 127, 795 P.2d at 931. Plaintiff asserts that defendant is liable for manufacturing and warning defects.

To establish a prima facie case under either theory, plaintiff must produce evidence to establish three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left defendant's control. Jenkins v. Amchem Prods., Inc., 256 Kan. 602, 630, 886 P.2d 869, 886 (1994); Lane v. Redman Mobile Homes, Inc., 5 Kan.App.2d 729, 733, 624 P.2d 984, 988 (1981) (theories of negligence, breach of implied warranty and strict liability share same proof requirements). Regardless of the theory on which recovery is sought, proof that a product defect caused the injury is a prerequisite to recovery under Kansas law. See Wilcheck v. Doonan Truck & Equip., Inc., 220 Kan. 230, 235, 552 P.2d 938, 942 (1976); Samarah v. Danek Med., Inc., 70 F. Supp.2d 1196, 1202 (D. Kan. 1999). As noted, Martin cannot testify that the manufacturing process introduced contamination into the bus bar insulation, and plaintiff has cited no other evidence that the bus bars were unreasonably dangerous when they left defendant's control.

-18-

Consequently, as a matter of law, plaintiff cannot establish a prima facie case of a manufacturing defect. The Court therefore grants summary judgment in favor of defendant on plaintiff's manufacturing defect claim.

As to plaintiff's failure to warn claim, defendant argues that it is entitled to summary judgment because plaintiff cannot show what warning should have been provided or that any proposed warning would have been feasible, adequate and effective. Plaintiff contends that Kansas law requires no such showing, and that expert testimony is not necessary to prevail on a failure to warn claim.[10]

Under Kansas law, a manufacturer has a duty to warn when it knows or has reason to know that its product is or is likely to be dangerous during normal use. Deines v. Vermeer Mfg. Co., 755 F. Supp. 350, 353 (D. Kan. 1990). Kansas courts measure a manufacturer's failure to warn "by whether it was reasonable under the circumstances, whether the claim is based on negligence or 'even if the claim is made under the rubric of a strict products liability defect.'" Miller v. Lee Apparel Co., Inc., 19 Kan. App. 2d 1015, 1029-30, 881 P.2d 576, 587 (1994) (quoting Richter v. Limax Int'l, Inc., 822 F. Supp. 1519, 1521 (D. Kan.1993)). Whether a warning is reasonable is an issue of fact for the jury. Patton v. Hutchinson Wil-Rich Mfg. Co., 253 Kan. 741, 762, 861 P.2d 1299 (1993).

Here, plaintiff does not dispute the feasibility, adequacy or effectiveness of the warning which defendant says it provided; plaintiff instead complains that defendant did not attach that warning to the busway in question. Plaintiff is correct that in such circumstances, Kansas law does not require expert testimony to prevail on a failure to warn claim. See Burton v. R.J. Reynolds Tobacco Co., 208 F.Supp.2d

---

[10]     For purposes of this motion, both parties apparently assume that defendant had a duty to warn.

1187, 1197 (D. Kan. 2002) (Kansas Supreme Court statement that expert testimony "should be considered" does not constitute requirement that plaintiff proffer such testimony). Furthermore, while plaintiff must establish the feasibility, adequacy and effectiveness of any alternative which it proposes, see Meyerhoff v. Michelin Tire Corp., 852 F. Supp. 933, 947 (D. Kan. 1994); see also Duffee v. Murray Ohio Mfg. Co., 879 F. Supp. 1078, 1084 (D. Kan. 1995), aff'd, 91 F.3d 1410 (10th Cir. 1996), plaintiff does not advocate an alternative warning in this case. Plaintiff has raised a genuine issue of material fact whether defendant provided the warning which it says it routinely attached to the busway systems. Therefore the Court cannot grant summary judgment in favor of defendant.

## 2.    Negligence Claim

Defendant argues that plaintiff cannot show that (1) it breached the standard of care; or (2) its negligence caused damage to plaintiff. The Court agrees. Plaintiff has offered no expert testimony or other evidence as to the proper standard of care in the manufacture of busway. Plaintiff's expert testimony regarding the presence of a manufacturing defect is inadmissible, and plaintiff has provided no other evidence of negligence. Without such evidence, plaintiff's negligence claim cannot survive summary judgment.

**IT IS THEREFORE ORDERED** that Defendant's Motion To Exclude The Testimony Of Plaintiff's Experts Carl Martin and Byron W. Sherman And Corresponding Motion For Summary Judgment (Doc. #85) filed January 28, 2005 be and hereby is **SUSTAINED in part and OVERRULED in part**. The Court overrules defendant's motion to exclude Carl Martin's testimony as to fire cause and origin and warnings, but sustains defendant's motion to exclude his testimony that the busway had a manufacturing defect. The Court grants summary judgment for defendant on plaintiff's manufacturing defect and

negligence claims, and denies summary judgment on plaintiff's failure to warn claim.

Dated this 10th day of May, 2005 at Kansas City, Kansas.

/s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge